# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

LAURA BARNES,

                         Plaintiff,

-vs-                                                    Case No.  6:05-cv-1299-Orl-JGG

COMMISSIONER OF SOCIAL
SECURITY,

                         Defendant.
_____

## MEMORANDUM OF DECISION

Plaintiff Laura Barnes ["Barnes"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REMANDED**.

## I.    PROCEDURAL HISTORY

On March 5, 20002, Barnes protectively filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of April 2001.  R. 52.  On October 15, 2005, the Honorable Henry U. Snavely, Administrative Law Judge ["ALJ"], held a forty five-minute hearing on Barnes' claim in Orlando, Florida.  R. 231 - 61.  Non-attorney Linda Reed represented Barnes at the hearing.  R. 231.  The ALJ heard testimony from Barnes.

On April 5, 2005 the ALJ issued a decision that Barnes was not disabled and not entitled to benefits.  R. 12.  Following a review of the medical and other record evidence, the ALJ found that Barnes could perform her past relevant work in customer service at an eye-glass store.  R. 17,

Finding 8.  The ALJ found that Barnes nevertheless retained the residual functional capacity

["RFC"] to perform the full range of sedentary work.  R. 17, Finding 7.  The ALJ concluded that

Barnes was not disabled as defined in the Social Security Act.  R. 18, Finding 10.

On July 1, 2005, the Appeals Council denied review.  R. 4.  On July 1, 2005, Barnes timely

appealed the Appeals Council's decision to the United States District Court.  Docket No. 1.  On

March 1, 2006, Barnes filed in this Court a memorandum of law in support of his appeal.  Docket

No. 15.  On May 1, 2006, the Commissioner filed a memorandum in support of the

Commissioner's decision that Barnes was not disabled.  Docket No. 16.  The appeal is ripe for

determination.

## II.    THE PARTIES' POSITIONS

Barnes assigns two errors to the Commissioner.  First, Barnes claims that the ALJ erred in

finding that Barnes could return to her past relevant work.  Docket No. 15 at 8.  Second, Barnes

claims that the ALJ erred by failing to give adequate reasons for discrediting Barnes' pain

testimony.  Docket No. 15 at 10.

The Commissioner argues that substantial evidence supports her decision to deny disability

and that the ALJ correctly found that Barnes could return to her past relevant work.  First, the

Commissioner argues that x-rays and other medical evidence support the finding that Barnes could

return to her previous work.  Docket No. 16 at 4-5.  Second, the Commissioner argues that the

record is devoid of evidence which substantiates that Barnes is totally disabled or that her pain was

of a disabling severity.  Docket No. 16 at 7.  Third, the Commissioner argues that, even if Barnes

were precluded from prolonged walking and standing, she could still perform her past work as a

customer service representative which required only two to three hours of walking per day. Docket No. 16 at 7.

III.    **THE STANDARD OF REVIEW**

      A.    **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B.** **REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

**C.** **REMAND**

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported

by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is

new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and 3.) there is good

cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 -

92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547,

1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v.*

*Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the

Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at

1095.  With a sentence-six remand, the parties must return to the district court after remand to file

modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending

remand, and does not enter a final judgment until after the completion of remand proceedings.[1]  *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe,

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

A.      DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

B.      THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520,  416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do

basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R.

§ 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's

impairments do not prevent him or her from doing past relevant work, she is not disabled.  20

C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional

capacity, age, education, and past work) prevent him or her from doing other work that exists in

the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must

consider any medically severe combination of impairments throughout the disability determination

process.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole

person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v.

Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the

reviewing court that the ALJ has considered all alleged impairments, both individually and in

combination, and must make specific and well-articulated findings as to the effect of a

combination of impairments when determining whether an individual is disabled.  *See Jamison v.

Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required

where the record contains a diagnosis of a severe condition that the ALJ failed to consider

properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the

Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is

-8-

unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.R. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.R. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

-10-

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion

if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such

weight as is supported by clinical or laboratory findings and other consistent evidence of a

claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also,*

*Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must

nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and

the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the

medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.)

specialization in the medical issues at issue; 6.) other factors which tend to support or contradict

the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally

entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d

513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a

medical source's statement that a claimant is disabled.  However, the ALJ is responsible for

making the ultimate determination about whether a claimant meets the statutory definition of

disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to

the status of a physician as treating or non-treating in weighing an opinion on whether the claimant

meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545

and 404.1546), or the application of vocational factors because those ultimate determinations are

for the Commissioner.  20 C.F.R. § 404.1527(e).

-12-

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v.*

-13-

*Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

G.     MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

V.     **APPLICATION AND ANALYSIS**

A.     **THE FACTS**

From April 2, 1998 to July 21, 2000, Barnes saw David S. Osteen, M.D., for pain involving her knees. Dr. Osteen diagnosed patellar tendinitis implicated in both knees and treatment included arthroscopy, chondroplasty, plica resection and physical therapy on the right knee. R. 128. Dr. Osteen restricted Barnes from work for much of 1998. R. 142- 63.

Barnes claims March 23, 2001, as her onset date. R. 61. On March 26, 2001, Barnes complained to Dr. Osteen of right arm and neck pain. R. 141. Dr. Osteen diagnosed epicondylitis of the right elbow, and prescribed anti-inflammatory medication, a corrective brace, and physical therapy. *Id.* He further restricted Barnes from work for one week. *Id.* On April 6, 2001, Barnes

saw Dr. Osteen complaining that the foot could not bear weight.  R. 140.  Examination revealed

swelling of the right foot and toes, tenderness over the medial and lateral malleolus and limited

ankle motion.  *Id.*  X-rays revealed no fractures of the ankle or foot.  *Id.*  Dr. Osteen prescribed

Vicodin, splinting, elevation, and restricted Barnes from work for one week.  *Id.*  In a nurse's

notation dated April 10, 2001, Barnes was unable to wear the splint due to pain and Dr. Osteen

prescribed wrapping the foot with an ace bandage.  *Id.*

Barnes returned to Dr. Osteen with multiple complaints on April 16, 2001.  R. 139.

Physical examination of the right foot showed persistent swelling in the ankle and foot – and

exquisite tenderness in the second, third, and fourth metatarsals.  *Id.*  Dr. Osteen guessed that

Barnes "probably [had] a stress fracture . . . of the foot."  *Id.*  Barnes' right arm showed no masses,

but there was tenderness over the ulnar nerve and medial epicondyle, and pain with resisted wrist

flexion.  *Id.*  Dr. Osteen noted that he was "not sure why [the arm] was hurting her."  *Id.*  Dr.

Osteen prescribed a night splint for the arm and a fracture boot for the right leg, and replaced

Barnes' Vicodin with Darvocet because the Vicodin was "making her sick to her stomach."  *Id.*

On May 3, 2001, Barnes returned to Dr. Osteen complaining of right arm and right foot

pain. R. 138.  Barnes right foot showed spasm of the tibialis anterior with neutral dorsiflexion and

plantar flexion, but the foot was supinated.  *Id.* Barnes' toes were stiff and tender to palpation.  X-

rays taken of the foot revealed no fractures.  *Id.*  Dr. Osteen noted that Barnes "may be getting

some RSD" in her right foot, and diagnosed medial epicondylitis and tendinitis in her right elbow.

He prescribed a total body bone scan and Flexeril, and recommended a neurological consult

regarding the foot.  *Id.*  Dr. Osteen cancelled physical therapy, and noted that Barnes was "not

going to be working for a while yet."  R. 138.

On May 24, 2001, Barnes returned to Dr. Osteen complaining that her foot "kills" her, and

that her arm continued to hurt her medially.  R. 137.  According to Barnes, Flexeril and Darvocet

helped somewhat with the pain.  *Id.*  Examination revealed tenderness in the forefoot and second

toe, with a lot of spasm in the tibialis anterior.  Dr. Osteen noted that Barnes could "barely evert

the foot, not even to neutral plantar grade position."  *Id.*

Dr. Osteen further noted that Barnes' elbow was still tender over the medial epicondyle.

*Id.*  Dr. Osteen's impression was inconclusive:

> She may have gout of the right second toe . . . .  It does not look like a tumor.  It
> could potentially be infection, but it does not look like that, either.  It seems that she
> has some type of dystonia involving the right foot.  The skin does not look like
> RSD.  She does not have the hyperesthesias and the bone scan does not show the
> hyperemia.

*Id.*  Dr. Osteen renewed Barnes' Darvocet prescription, and ordered an MR to rule out

osteomyelitis of the second toe, ordered a neurological consult, and ordered an EMG and nerve

studies to "see if they have any idea why she is so painful and spastic in the right foot."  *Id.*  Dr.

Osteen further noted that Barnes was "still not capable of doing any kind of work for the next

month."  *Id.*

On June 19, 2001, Dr. Osteen saw Barnes again for a follow-up.  R. 136.  Barnes

complained fo right foot and right arm pain, but that she felt "somewhat better."  *Id.*  Examination

revealed that Barnes' right foot was still inverted but that she could move it to a neutral position,

had spasticity of the tibialis anterior, and that there was swelling of the second toe.  Dr. Osteen

noted that the MR report showed "edema within the second toe and some soft tissue edema in the facial planes adjacent to that. [There was] no change significant for gout or osteomyelitis." *Id.* Dr. Osteen's impression was right foot spasticity and right arm pain, and noted that the etiology of both were "kind of unclear." Dr. Osteen renewed Barnes' Darvocet prescription and prescribed Voltaren DMSO gel for the toes and right arm, and reiterated his instructions to see a neurologist. *Id.*

On July 18, 2001, Barnes sought a consultative examination from Stephen J. Rosenberg, M.D., FAAN, who was board certified in Neurology and Neurorehabilitation. R. 98 -101. Dr. Rosenberg observed that Barnes came to the office wearing a corrective boot "which [was] the only thing that [provided] her with enough pain relief to get around." R. 100. He further observed that Barnes exhibited an equivocal zone of hypesthesia involving the right foot, and that her gait was antalgic secondary to pain. *Id.* Dr. Rosenberg's impressions included 1.) right elbow localized pain – medial epicondylitis; 2.) rule outright ulnar neuropathy secondary to compression at the cubital tunnel; 3.) stress fracture, right foot; 4.) possible right peroneal palsy; 5.) possible upper motor neuron process. *Id.* He ordered standard myelopathy and neuropathic metabolic screens. R. 101.

On July 23, 2001, Barnes revisited Dr. Osteen with complaints of pain in the right arm and right foot. R. 135. And Dr. Osteen's physical exam revealed no change. *Id.* Dr. Osteen noted that Barnes' EMG studies showed "moderate severe" peroneal and tibial neuropathy in the right leg that seemed to be distal and not proximally mediated. *Id.* Dr. Osteen assessed neuropathy in the right leg and noted that there was "[s]ome type of abnormal situation here in terms of the injury

after her sprain back in March.  I really do not know why she is hurting so much."  *Id.*  Dr. Osteen

prescribed a light weight AFO for the right leg.  *Id.*  He further noted that Barnes was "really not

capable of working because she cannot walk or really drive much."  *Id.*

On September 6, 2001, Dr. Rosenberg saw Barnes and noted "no real change in her right

lower extremity symptomology."  R. 98.  His assessment of Barnes' EMG studies were that

abnormalities were minimal, the peroneal nerves were relatively normal, and Barnes' reflexes were

normal.  *Id.*  Physical examination revealed considerable tenderness around the dorsum of the foot

and ankle, considerable edema, and what appeared to be a spasm involving the tibialis anterior.  *Id.*

Dr. Rosenberg opined:

> Her picture currently appears consistent with true complex regional pain syndrome
> II (reflex sympathetic dystrophy).  These patients will sometimes develop spasm
> and dystonia ("RSD-dystonia syndrome").  This truly seems to be the situation here.

*Id.*  Dr. Rosenberg prescribed Amitriptyline, and noted that he would discuss with Dr. Osteen

referring Barnes to a subspecialist who deals with RSD.  R. 98.

On September 20, 2001, Barnes came to Dr. Osteen following a motor vehicle accident

complaining of neck pain.  R. 134.  Examination revealed tenderness in the mid to lower cervical

area with some restriction in motion. *Id.*  Barnes' reflexes remained normal, her motor strength

was grossly intact, and x-rays looked "quite good and normal."  *Id.*  Dr. Osteen assessed cervical

sprain and prescribed Oxycontin and Norflex as well as physical therapy.  *Id.*

On November 5, 2001, Barnes returned to Dr. Osteen noting that her right ankle still hurt

and was still swollen.  R. 133. She also complained of pain in her left knee medially. Dr. Osteen

noted that Barnes had seen Dr. Rosenthal, a neurologist, who did not think she was a candidate for

-19-

Botox treatment.  Instead, Dr. Rosenthal had prescribed Elavil, which Barnes said she had recently started taking.  *Id.*  Dr. Osteen assessed partial peroneal palsy of the right foot, and that an ankle-foot brace ("AFO") was medically necessary for Barnes to ambulate, and the brace would help prevent further injury to the left knee.  *Id.*  He prescribed Gabapentin for the right leg and Keto-Lido-Serapin Gel for the left knee.  *Id.*

According to a nurse's notation dated November 12, 2001, Barnes called Dr. Osteen with complaints of a lot of pain. *Id.*  Dr. Osteen recommended that Barnes make an appointment.  *Id.*  On November 20, 2001, Barnes returned to Dr. Osteen and informed him that she was "feeling worse," that she could not "walk very far," and that she had "gone to the store and could not get back out after walking inside for awhile."  R. 131.  Examination did not show much tenderness in the foot, but her second toe was very "tight" and Barnes could not flex or extend it.  *Id.*  Barnes also had "overpowering hypertonicity of the tibialis anterior."  *Id.*

Dr. Osteen diagnosed right foot dystonia, and prescribed Norflex and Keto-Lido-Serapin Gel[2] for the sore area. *Id.*  Dr. Osteen further opined:

> I do not think there is really that much else we can do.  [ ]  I do not think she is really capable of working at any type of a standing job.  If they have something sitting I think she could do that, but she is not going to be able to be up and standing, walking or ambulating very far indefinitely.

*Id.*  Dr. Osteen wanted to see Barnes again in "a couple of months."  *Id.*

On December 13, 2001, Barnes saw Dr. Osteen again with complaints that her foot showed no improvement, and that her left knee continued to bother her. R. 130.  Barnes also informed Dr.

---

[2]The Keto-Lido-Serapin Gel prescription was labeled "For RSD, Myofacial Pain, Causalgia, TMJ, Misc. Pain Gel." R. 132.

Osteen that she was unable to procure the AFO brace.  *Id.*  Examination of the left knee showed tenderness over the pes tendons, and that the right ankle was still swollen and tender.  *Id.*  Dr. Osteen again diagnosed right foot dystonia and left knee pes tendinitis.  *Id.*  He opined that Barnes needed a custom AFO brace, and if she was unable to get one, Dr. Osteen would cast her ankle for six weeks.  *Id.*

On December 18, 2001, Barnes visited Dr. Rosenberg.  R. 97.  Dr. Rosenberg noted:

Mrs. Barnes is not substantially better.  [ ] She still has absolutely intractable and incapacitating pain involving the right foot with dystonic posturing, and I am concerned about the fact that the pain seems to be moving proximally.  Her examination continues to show marked hypesthesia and tenderness over the foot and ankle with plantar deviation and edema.

*Id.*  He expressed concern that Barnes appeared to have "definite complex regional pain syndrome II" [sic] and that there was a danger of dissemination.  Dr. Rosenberg increased Barnes' Amitriptyline dosage, and directed her to see a pain specialist "on a relatively urgent basis."  *Id.*

On February 21, 2002, Barnes sought an initial pain consultation with Richard L. Smith Sanchez, M.D.[3]  R. 174.  Barnes complained of aching, burning, shooting, and throbbing pain which increased with walking, standing for long periods, driving , and wearing shoes.  *Id.*  She described the pain as constant in the top of the foot and toes, at a level of ten on a scale of zero to ten.  *Id.*  Dr. Smith Sanchez' examination revealed pain in the lumbar spine with extension and lateral tilting, and positive straight leg raising on the right.  R. 175.  Barnes' right second toe

---

[3]At various points in the record, Dr. Smith Sanchez is referred to as "Dr. Smith" (See, e.g. R. 175).  For purposes of consistency, this opinion uses Dr. Smith Sanchez' full name.

showed positive allodynia[4] to palpation.  Dr. Smith Sanchez further observed that Barnes had

decreased inversion of the right foot, and that there was mild swelling as compared to the left foot.

*Id.*  Dr. Smith Sanchez assessed radicular leg pain, with signs and symptoms of neuropathic pain

after an injury of the right ankle, and ordered an MRI of Barnes' lumbar spine and prescribed a

Lidoderm patch for the right ankle.  *Id.*

On February 27, 2002, Barnes underwent an MRI.  R. 173.  The impression was some disc

herniation at 5-1, with no spinal or foraminal stenosis, and very subtle disc protrusion at 4-5, again

with no significant stenosis.  *Id.*

In a follow-up report dated March 21, 2002, Dr. Smith Sanchez noted that Barnes was "not

doing well" and was having severe pain in the right hip radiating down to the right foot.  R. 172.

The right foot continued to exhibit inversion and allodynia.  *Id.*  Dr. Smith Sanchez assessed 1.)

displaced lumbar disc; 2.) CRPS Type I; and 3.) that Barnes was not responding to medication.  *Id.*

Dr. Smith Sanchez scheduled Barnes for lumbar epidurals and prescribed Neurontin and

Oxycontin.  *Id.*

On March 21, 2002, Barnes returned to Dr. Osteen complaining that she had not improved.

R. 129.  Dr. Osteen noted that Barnes had been to see Dr. Rosenberg, and that Dr. Rosenberg

diagnosed complex regional pain syndrome.  Dr. Osteen further noted the results of Barnes'

February 2002 MRI.  *Id.*  Examination revealed increased pain in the right leg and foot, diffuse

tenderness with hyperesthesia around the foot and ankle, and that Barnes tended to hold her great

---

[4]A condition in which ordinarily nonpainful stimuli evoke pain.  STEDMAN'S MEDICAL DICTIONARY 50 (26th ed. 1995).

toe extended while the foot was plantar flexed and supinated.  *Id.*  Dr. Osteen assessed right foot

pain with dystonic posturing with the following notation:

> I would defer definitive diagnosis to Dr. Rosenburg [sic] and the pain management
> to Dr. Smith.  I did give her some neuropathy gel that she could try on it.  I have
> asked her to have them keep me informed of her progress.  There is really nothing
> else that I can do with her.

R. 129.

On May 14, 2002, Dr. Smith Sanchez performed a lumbar epidural steroid injection on

Barnes.  R. 170.  Pre-surgical examination revealed positive inversion of the right foot and positive

allodynia in the right second toe.  R. 171.  Dr. Smith Sanchez further described Barnes as a well

known patient with "severe intractable right lower extremity pain.  *Id.*  The pre-operative diagnosis

was displaced lumbar disc and right lower leg pain.  R. 170.  The post-operative diagnosis was

unchanged.  *Id.*

In follow-up notes dated May 23, 2002, Dr. Smith Sanchez commented that Barnes was

"doing a little bit better after lumbar injections," and was tolerating medications and not having

any major side effects. R. 169.  He noted that she was responding slowly to treatment.  *Id.*

In treatment notes dated July 16, 2002, Dr. Smith Sanchez indicated that Barnes was

"doing fair"and that she was tolerating medication without side effects. R. 168.  He noted that

Barnes reported increased burning sensation down her legs.  Dr. Smith Sanchez increased the

Neurontin dosage and recommended continued Oxycontin.  *Id.*

On September 3, 2002, Barnes saw Dr. Osteen with complaints of pain in both knees for

the last two to three months, with the left knee hurting worse than the right.  R. 128.  She further

complained of right hip pain.  *Id.*  Examination revealed that Barnes was in no acute distress, had a

moderately antalgic limp, and that the previously prescribed AFO fit her well.  *Id.*  There was no significant tenderness in the right knee, but there was subpatellar crepitus and the hamstrings were tight.  *Id.*  The left knee showed tenderness over the pes bursa, the ligaments were intact , and there was no obvious effusion.  Id.  The right hip revealed tenderness over the greater trochanter and gluteus medius tendon.  *Id.*  Dr. Osteen diagnosed left knee pes tendinitis, right hip bursitis, right knee pain with a likelihood of chondromalacia patella.  *Id.*  Dr. Osteen commented that there was "[n]ot a whole lot we can do with her medically-wise" and prescribed Bextra, stretching exercises, and ice.  *Id.*

On September 5, 2002, Nitin Haté, M.D., examined Barnes at the request of the Office of Disability Determinations.  R. 102-04.  Dr. Haté noted that Barnes gave a history of right ankle and foot RSD and a herniated disc at l4-5.  R. 102.  Examination revealed that Barnes' right ankle was held in eversion and Barnes was unable to straighten it.  *Id.*  Dr. Haté' reviewed some of Dr. Smith Sanchez' and Dr. Osteen's notes, and concluded that the records were consistent with the diagnosis of radicular leg pain and neuropathic pain in the right ankle and right foot dystonia.  R. 104.  Dr. Haté offered a differential diagnosis of dystonia versus functional – noting that when Barnes wore her brace, she could walk with a flat foot.  *Id.*  Dr. Haté opined that Barnes "may have some difficulty in activities that require prolonged walking, climbing stairs or ladders, and repetitive stooping."  *Id.*

In treatment notes dated September 25, 2002, Dr. Smith Sanchez indicated that Barnes was "doing fair," was tolerating her medications and most of her daily activities.  R. 167.  He noted

that Barnes was "active."  *Id.*  Dr. Smith Sanchez noted no new symptoms and prescribed continued medication.  *Id.*

Also on September 25, 2002, a non-examining state physician opined as to Barnes' RFC. R. 105-12.  The physician diagnosed low back pain syndrome and right ankle RSD.  R. 105.  The physician determined Barnes' exertional limitations to include occasionally lifting fifty pounds, frequently lifting 25 pounds, standing and walking for six hours in an eight hour workday, sit about six hours in an eight hour workday, with no restrictions on pushing or pulling.  R. 106.

On October 22, 2002, Barnes saw Julio Gonzalez, M.D., for a trauma to her left long finger resulting from slamming it in a closet door.  R. 127.  Dr. Gonzalez noted that Barnes' history was significant for a right lower extremity with partial perineal palsy of the right foot and RSD.  *Id.* Dr. Gonzalez observed that sensation was intact, and that there was no deformity, crepitus, or erythema in the finger.  *Id.*  He diagnosed a contusion, and recommended resuming activities as tolerated.  *Id.*

On December 9, 2002, Barnes returned to Dr. Osteen complaining of severe right leg pain. R. 126.  Barnes indicated that her right calf swells with use, and that if she did not use her AFO, she could not walk.  *Id.*  She also indicated dislike of the amount of medications prescribed to her by her  pain management physician.  *Id.*  Examination demonstrated involuntary dystonia of the right lower extremity, with some ecchymosis[5] in the distal leg, but no real swelling.  *Id.*  Dr. Osteen assessed chronic right foot dystonia and noted:

> There is not a heck of a lot else I can do with her.  She can try some keto-lido,
> Flexeril half at night, as a regular dose of Flexeril really zonks her.  She can try

[5]A purplish patch caused by extravasation of blood into the skin.  Stedman's p. 539.

some Bextra as well.  I would really like to find someone who would do at least a trial of injection into the anterior tibial muscle with some Botox.

*Id.*

On December 18, 2002, Barnes sought a consultative examination from Marla Richardson-Price, M.D., on the advice of Dr. Osteen.  R. 215-17.  Barnes informed Dr. Richardson-Price that she was under a neurologist's care who diagnosed RSD.  R. 215.  Physical examination revealed mild non-pitting edema in the right lower extremity, atrophy of the right gastroc muscle, and that Barnes' right ankle was fixed in an everted position.  R. 216.  The right ankle joint showed tenderness, and Dr. Richardson-Price noted that there was decreased sensation in the web between the first and second digits of Barnes' right foot.  R. 216-17.  Barnes' balance was found to be limited to short distances, she needed to use furniture to ambulate, and was unable to stand on her right heel or toes.  R. 217.  Dr. Richardson-Price assessed chronic right foot and ankle pain status post trauma, gait abnormality secondary to pain, and chronic low back pain.  *Id.*  She recommended that Barnes continue her medications, and consult with another physician regarding Botox.  *Id.*  Dr. Richardson-Price further expressed a desire to obtain Barnes' complete medical records.  *Id.*

On December 31, 2002, Barnes followed-up on Dr. Richardson-Price's examination by seeing Michael J. Creamer, D.O.  R. 214.  Barnes symptoms remained unchanged, and examination revealed her right foot and ankle to be in the equinovarus position, with a limited range of motion.  *Id.*  Barnes' was able to ambulate with the use of her AFO and a straight cane.  *Id.*  Like Dr. Richardson-Price, Dr. Creamer assessed chronic right foot and ankle pain status post trauma, gait abnormality secondary to pain, and chronic low back pain.  *Id.*  He recommended that

Barnes undergo a right sciatic nerve block, in order to determine whether she was a good candidate for Botox. *Id.* On January 16, 2003 Barnes underwent a right sciatic nerve block.[6] R. 213.

In treatment notes dated January 28, 2003, Dr. Smith Sanchez indicated that Barnes was "not doing well." R. 166. Barnes was having severe pain in her right leg, ankle, and foot. *Id.* Dr. Smith Sanchez noted that, though she tolerated the medications well and had no major side effects, the medications were not enough to control her pain. *Id.* Dr. Smith Sanchez assessed radicular leg pain and a displaced lumbar disc, and scheduled Barnes for a second lumbar epidural. *Id.*

On January 30, 2003, Barnes returned to Dr. Creamer for Botox injections. R. 212. Dr. Creamer noted that Barnes was "very pleased with the temporary effects of the nerve blocks." *Id.* Physical examination revealed that Barnes right foot was still in equinovarus deformity with plantar flexion and spasticity. *Id.* Barnes had limited ability to ambulate and bore weight predominantly on the outside of her right foot. *Id.* Barnes received a total of six Botox injections in the posterior tibialis, gastrocnemius, and soleus muscles. *Id.* She tolerated the procedure well and there were no complications. *Id.*

On February 24, 2003, Barnes underwent a second lumbar epidural, performed by Dr. Smith Sanchez, which she tolerated well. R. 165.

On March 5, 2003, Barnes saw Dr. Richardson-Price to follow-up on her condition after the Botox injections. R. 211. Barnes reported that her pain relief was better with the nerve block than with the Botox injections, but she had "marked improvement in her spasticity and mobility in

---

[6]Dr. Creamer's office notes initially refer to the procedure as a "left sciatic nerve block," but this appears to be in error, as these same notes indicate that "[t]he patient was placed in the prone position and the region of the *right* sciatic nerve and the popliteal fascia were located . . . ." R. 213 (emphasis added).

her right foot." *Id.* Barnes reported that because her foot had relaxed, her AFO no longer fit properly, and she had ceased using it. *Id.* Examination revealed no swelling or edema, but there continued to be plantar flexion eversion without spasticity and a limited range of motion in the right foot. *Id.* Dr. Richardson-Price prescribed a new AFO and recommended medication adjustments regarding Barnes' Neurontin to assist with her "neuropathic-type pain symptoms." *Id.*

On March 28, 2003, non-examining state physician, Keith R. Holden. M.D., opined as to Barnes' RFC. R. 176-183. Dr. Holden assessed dystonia of the right lower extremity and degenerative disc disease of the lumbar spine. R. 176. The physician determined Barnes' exertional limitations to include occasionally lifting twenty pounds, frequently lifting ten pounds, stand and walk for at least two hours in an eight hour workday, sit about six hours in an eight hour workday, with restrictions on pushing or pulling with her lower extremities, due to dystonia/RSD of the right foot. R. 177.

On April 24, 2003, psychologist David J. Fleischmann, Ph.D., examined Barnes at the request of the Office of Disability Determinations. R. 184-86. Dr. Fleischmann noted that Barnes' history was significant for herniated disc, sciatica, and right foot rheumatic dystrophy and dystonia. R. 184. Barnes stated that her pain was a six on a scale of one to ten with medication, and that she had reduced her need for pain medication to approximately once or twice per week and when she has to be has to be on her feet for over a half hour. R. 184-85. She informed Dr. Fleischmann that her pain medications left her tired, and readily affected her visual acuity. R. 185. Barnes indicated that she discussed these side effects with her doctor and that the "only alternative

is to be without the medication." According to Barnes, she would be "unable to tolerate" the pain without medication. *Id.*

Barnes described her daily activities as primarily sitting in her recliner and watching T.V. *Id.* She stated that her eldest daughter did the vacuuming, her son did the dishes, and friends and family helped with the laundry. *Id.* She further stated that she sometimes prepared a "simple breakfast" but her husband cooked the dinner meal when he was home. *Id.* Dr. Fleischmann noted that Barnes attention and concentration were sustained, that her thought processes were linear and goal oriented, and that her impulse control, judgment and insight were good. *Id.* He diagnosed an adjustment disorder with mixed anxiety and depressed mood accompanied by a chronic pain disorder associated with both psychological factors and general medical condition. Dr. Fleischmann recommended counseling. *Id.*

In follow-up notes dated May 29, 2003, Dr. Smith Sanchez commented that Barnes was "not doing very well" and was experiencing increased back pain radiating into both legs. R. 226. Dr. Smith Sanchez noted, though she tolerated the medications well and had no major side effects, the medications were not enough to control her pain. *Id.* He increased the dosage of Barnes' Oxycontin and scheduled her for additional lumbar epidurals and facet injections. *Id.*

On May 13, 2003, Barnes underwent left side lumbar facet joint injections, performed by Dr. Smith Sanchez. R. 225. On July 17, 2003, Barnes underwent her third lumbar epidural. R. 224. On August 1, 2003, Barnes underwent right side lumbar facet joint injections. R. 223. Two weeks later, on August 15, 2003, Barnes underwent a second round of left side lumbar facet joint

injections.  R. 222.  In all four instances, Barnes tolerated the procedures, and there were no

complications.  R. 222-25.

 In follow-up notes dated September 3, 2003, Dr. Smith Sanchez commented that Barnes

was "doing a little bit better" after the lumbar injections, and that her medications were helping to

maintain her pain under tolerable conditions without any major side effects.  R. 221.  Dr. Smith

Sanchez prescribed continued use of Oxycontin and Neurontin.  *Id.*

 In follow-up notes dated December 15, 2003, Dr. Smith Sanchez commented that Barnes

was "doing better" and that her pain was not as severe.  R. 220.  Because Barnes was tolerating her

medications, Dr. Smith Sanchez prescribed continued use of Oxycontin and Neurontin.  *Id.*

 In follow-up notes dated February 17, 2004, Dr. Smith Sanchez commented that Barnes

was "doing fair" and that she was "functional and tolerating most of her daily activities" with no

major side effects from her medications.  R. 219.  He prescribed continued use of Oxycontin and

Neurontin.  *Id.*

 In follow-up notes dated April 27, 2004, Dr. Smith Sanchez commented that Barnes was

"not doing very well" and noted that she had acute exacerbation of her chronic low back pain

radiating into the right lower extremity.  R. 227.  He further noted that Barnes was tolerating her

medications, but they were not enough to control her pain.  *Id.*  Dr. Smith Sanchez scheduled

Barnes for additional epidural and lumbar facet injections and prescribed continued use of

Oxycontin and Neurontin.  *Id.*

 The ALJ held a hearing on October 15, 2004.  R. 233-61.  Barnes appeared in person and

was represented by non-attorney Linda Reed.  R. 231.  Ms. Reed submitted a pre-hearing

memorandum to the ALJ which cited SSR 03-2p as authority for evaluating Barnes' disability based on RSD, and called attention to Dr. Rosenberg's September 6, 2001 and December 18, 2001 RSD diagnoses. R. 208-09.  At the start of the hearing, the ALJ acknowledged receipt of the pre-hearing memorandum and asked for opening comments. R. 236.  Ms. Reed stated that Barnes suffered a sprained ankle which developed into incurable RSD, and that the Social Security Administration had a regulation for evaluating cases involving RSD. R. 236-37.  *Id.*

During his examination, the ALJ asked Barnes about her work history. R. 241-43.  He specifically inquired about Barnes' customer service position at Opti-World:

> Q: What did you have to do there?
>
> A:  I greeted customers as they came in, assisted the customer to the appropriate salesperson.
>
> Q: Okay.  Is that pretty much sedentary work?  Sitting down?
>
> A: Yes.

R. 243.

Barnes testified that she did not fix meals for her family, that she did not drive due to the pain in her right leg and back, and that the pain in her leg, back and arm prevented her from performing daily activities. R. 245- 46.  She further stated that she had been five months without medical care, and that she recently sought medical treatment at a walk-in clinic[7] because her pain was getting progressively worse and becoming "overwhelming." R. 247.  Barnes did not identify her current pain medications, but stated that they made her nauseous if taken with food. R. 249.

---

[7]Barnes identified her new treating physicians as Dr. Lieberman and Dr. Lacey, but the record is devoid of any examination or treatment notes from either doctor.

-31-

Barnes described her pain as a ten on a scale of one to ten, though medication reduced her

pain to a level of four.  R. 254.  She indicated that she could not drive while on pain medications

because they tended to make her dizzy and nauseous.  R. 254-55.  When asked about Dr. Smith's

Oxycontin prescriptions, Barnes testified that Oxycontin had made her sick, and that she suffered

memory loss, anxiety, blurred vision, heart rate acceleration, and dizziness as a result of taking

Oxycontin and Neurontin.  R. 251.  Barnes further stated that she had informed Dr. Smith of these

side effects and asked for him to change her medication, but that Dr. Smith's response was that he

was providing the "best medicine therapy that he could prescribe."  R. 252.

Barnes stated that the pain in her right foot prevented her from being able to wear a shoe on

that foot, because of the added pressure and weight of the shoe.  R. 253.  She described her daily

pain as unbearable to the point that she needed her husband's assistance to go to the bathroom,

could not care for her children, and that moving from a standing to a sitting position could cause

tears.  R. 258-60.

## B.    THE ANALYSIS

Barnes claims that the ALJ erred in finding that Barnes could return to her past work.

Specifically, Barnes claims that the ALJ erred by failing to give adequate reasons for discrediting

her pain testimony.  Docket No. 15 at 10.  Barnes is correct, and remand is required.

### 1.    Policy Interpretation Ruling SSR 03-2p on Reflex Sympathetic Dystrophy Syndrome

Barnes claims pain resulting from a combination of impairments that includes Reflex

Sympathetic Dystrophy Syndrome (RSD), also known as Complex Regional Pain Syndrome, Type

I.  Stephen J. Rosenberg, M.D., Barnes's board certified treating neurologist, diagnosed her with

-32-

RSD.  R. 97 - 98.  The pathogenesis of RSD is not fully understood, and it is a particularly difficult disorder to diagnose.  Recognizing this, the Commissioner issued Policy Interpretation Ruling SSR 03-2p (effective October 20, 2003), which applies in this case.

     RSD is a syndrome characterized by complaints of intense pain, and typically includes signs of autonomic dysfunction.  SSR 03-02p.  The pain syndrome most often results from trauma to a single extremity.  A troublesome characteristic of this syndrome is that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. When left untreated, the signs and symptoms of the disorder may worsen over time and can spread to different parts of the body.  SSR 03-2p.

     The Commissioner recognizes RSD as a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings.  Policy Interpretation Ruling SSR 03-2p describes those appropriate medical signs, symptoms, and findings; sets out the diagnostic criteria for RSD; describes RSD's typical presentment; and explains how to judge efficacy of treatment.  For the purposes of Social Security disability evaluation, clinically-documented swelling in the affected region can establish RSD in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant.  SSR 03-2p.  Disability adjudicators can reliably determine the presence of RSD as a medically determinable impairment when longitudinal treatment records document persistent, limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since injury.  SSR 03-2p.  The signs may not be present

-33-

continuously, however, because transient findings are characteristic of RSD and do not affect a finding that a medically determinable impairment is present.  SSR 03-2p.

Longitudinal clinical records reflecting ongoing medical evaluation and treatment are very helpful, especially from treating sources.  Where additional information is need to evaluate disability from RSD, an adjudicator must first re-contact an individual's treating sources.  An adjudicator must give controlling weight to a medical source's medical opinion on the nature and severity of an individual's impairment from RSD if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the case.[8]  SSR 03-2p.

Chronic pain caused by RSD and many of the medications prescribed to treat it may affect an individual's ability to maintain attention and concentration, as well as adversely affect cognition, mood, behavior, and motor reaction times. These factors can interfere with an individual's ability to sustain work activity over time, or preclude sustained work activity altogether.  Accordingly, the effects of chronic pain and the use of pain medications must be carefully considered when evaluating RSD.  SSR 03-2p.

Assessment of a claimant's subjective pain testimony and credibility are related.  The pain standard requires evidence of an underlying medical condition, and either objective medical

---

[8]The United States Court of Appeals for the Eleventh Circuit has not yet decided a disability appeal involving RSD. Other courts, however, have applied disability law to claimants with RSD.  *See Maiorano v. Barnhart*, 105 Fed. Appx. 374, 378 (3d Cir. 2004) (holding that ALJ's decision was not supported by substantial evidence where ALJ failed to address a treating physician's RSD diagnosis); Brooks v. Barnhart, 428 F. Supp. 2d 1189, 1192-93 (N.D. Ala. 2006) (remanded and benefits awarded where ALJ failed to accord long term treating physician proper weight and where ALJ's discrediting claimant's subjective pain testimony was inconsistent with SSR 03-2p and not supported by substantial evidence); *McFarland v. Barnhardt*, 2005 WL 1046503 at 4 (W.D. Wis.) (remand necessary where ALJ failed to obtain additional information regarding plaintiff's credibility as set forth in SSR 03-2p).

evidence that confirms the severity of the alleged pain arising from that condition, or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  If the ALJ then decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62.

### 2.     Application to Barnes

The ALJ recognizes that Barnes claims disability "due to RSD with severe pain in the foot, ankle, and hip, depression, anxiety, and memory loss."  R. 12.  The ALJ also notes Dr. Osteen's impression that Barnes might be developing RSD in her foot, and observes that "Dr. Osteen was at a loss as to why the claimant was hurting so much since x-rays were normal."  R. 14.  The ALJ rejected Barnes's testimony about severe pain in her right ankle, right arm, back, leg, and foot, finding Barnes "not totally credible" regarding her limitations.  R. 15, 17, Finding 5.  The ALJ found that "the evidence does not support the claimant's allegation of the intensity and persistence of such pain and other symptoms." R. 16.

The ALJ found that Barnes failed to prove disabling pain, although he did find that Barnes has a medically determinable impairment that could reasonably be expected to produce some of the pain and other symptoms alleged.[9]  R. 16.  It is very significant, however, that the ALJ excluded RSD from Barnes's medically determinable impairment.  The ALJ found that Barnes had only an "affective disorder, degenerative disc disease of the lumbar spine, obesity, and dystonia/neuropathy of the right lower extremity."  R. 17 - 18, Finding 9.  Having omitted RSD as

---

[9]Of course, it would be very difficult to quantify how much pain could reasonably be expected and how much could not, and the ALJ did not attempt to do so.

an impairment, the ALJ concluded that Barnes's medically determinable impairment could not reasonably be expected to produce the level of pain and other symptoms that she claimed, and that Barnes could perform her past work in customer service — sedentary work.  R. 17.

Of course, a credibility finding must be predicated upon an accurate determination of the claimant's underlying medical condition.  If the ALJ begins by not properly considering all of the alleged impairments, then credibility findings regarding a claimant's subjective pain testimony may be in error.  In this case, the ALJ never refers to Dr. Rosenberg's RSD diagnosis, and never states with particularity the weight he assigned to Dr. Rosenberg's medical opinion.

Dr. Rosenberg was a treating physician,[10] a board certified neurologist, who evaluated Barnes on several occasions over the relevant period and prescribed medication for RSD.  As such, his opinion was entitled substantial weight, absent good cause for discounting his opinion.  *See, e.g., Nyberg v. Commissioner*, 179 Fed. Appx. 589, 591 (11th Cir. 2006) (holding that ALJ's failure to address physician's opinion was reversible error where physician treated claimant for complaints unrelated to disability but was nonetheless a treating source who saw claimant numerous times during the relevant period).  By ignoring Dr. Rosenberg's RSD diagnosis, the ALJ failed to consider a potentially severe medically determinable condition.  Where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly, remand is necessary.  *Vega,* 265 F.2d at 1219.

---

[10]A "treating source" (i.e., a treating physician) is a claimant's "own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502.

To assist a reviewing court, the ALJ must consider all alleged impairments, and make specific and well-articulated findings as to the effect of impairments when determining whether an individual is disabled.  *See Jamison,* 814 F.2d at 588 - 89.   When RSD is one of the alleged impairments, the ALJ must follow SSR 03-2p.  See 20 C.F.R. § 402.35(b)(1).  The ALJ is not required to cite the ruling specifically, but the ALJ's decision must be consistent with the ruling and supported by the record.  *See Jones v. Commissioner*, 181 Fed. Appx. 767, 770 (11th Cir. 2006).  In the event of error in applying the law, regulations and rulings, the Appeals Council considers whether there is a basis for remand.  In this case, it does not appear that the ALJ and Appeals Council followed and applied SSR 03-2p.[11]

The ALJ's unexplained conclusion that Barnes did not have medically determinable RSD seems inconsistent with SSR 03-2p.  Dr. Osteen is Barnes's treating orthopedic surgeon of many years.  R. 137.  Although Dr. Osteen at first thought that Barnes's "skin does not look like RSD," R. 137, he later deferred definitive diagnosis to Dr. Rosenberg, Barnes's a board certified treating neurologist.  R. 129.  Dr. Rosenberg diagnosed "true complex regional pain syndrome II (reflex sympathetic dystrophy" or "RSD-Dystonia syndrome."  R. 97 - 98.  Dr. Osteen also deferred pain management to Dr. Smith Sanchez, Barnes's treating pain specialist who is board certified in anesthesiology and pain management.  R. 129, 172.  That same day, Dr. Smith Sanchez diagnosed Barnes with CRPS Type I,  which is synonymous with RSD, and changed her medications.  R. 172.  No examining physician ruled out RSD.  Further, the diagnoses of other doctors –

---

[11]The ALJ never cites SSR 03-2p in his decision. While this alone is not indicative of a failure to comply with the Ruling, the fact that the ALJ did cite Social Security Rulings 96-2p, 96-3p, 96-4p, 96-6 p, 96-7p, and 96-8p casts some doubt as to whether SSR 03-2p was ever considered.

neuropathy, radicular leg pain, dystonia, and non-specific chronic foot and ankle pain – do not

exclude RSD.  The ALJ failed to explain why he discounted the apparently uncontradicted opinion

of at least one specialized treating physician – whose opinion was "entitled to deference" and

possibly controlling weight under SSR 03-2p.

The ALJ is trusted to resolve inconsistencies and conflicting evidence in the record.  *See*

*Wheeler*, 784 F.2d at 1075.  Nevertheless, inconsistencies alone may be insufficient to reject a

diagnosis of RSD by a treating physician.  The Commissioner recognizes that the pattern of RSD

symptoms may not be entirely consistent due to the "transitory nature of its objective findings and

the complicated diagnostic process involved."  SSR 03-2p.  Indeed, SSR 03-2p states that

"conflicting evidence in the medical record is not unusual" in RSD cases, and advises adjudicators

to seek clarification of any such conflicts from the individual's treating or other medical sources.

SSR 03-2p.  There is no indication that the ALJ sought clarification for any perceived evidentiary

conflicts regarding Dr. Rosenberg's RSD diagnosis.

## VI.   <u>CONCLUSION</u>

In this case, the longitudinal treatment record contains Barnes' persistent complaints of

chronic intractable pain that is disproportionate to her injury.  R. 97, 126, 129, 130, 133, 135, 136,

137, 171, 174, 185, 214, 217, 245-47.  Also consistent throughout the treatment record is objective

medical documentation of swelling and edema in Barnes' right foot, which is one of the RSD signs

set forth in SSR 03-2p.  R. 98, 130, 133, 136, 139, 140, 175, 216.  The ALJ failed to articulate why

he rejected RSD as a medically determinable impairment in light of the longitudinal treatment

record containing Dr. Rosenberg's diagnosis of RSD (in which Dr. Smith Sanchez concurred and

-38-

to which Dr. Osteen deferred).  Citing SSR 03-2p (pertaining to RSD), Barnes raised the issue

before the Appeals Council, R. 229, but the Appeals Council denied review.  R. 4.  The ALJ and

Appeals Council may have ignored  SSR 03-2p in determining Barnes's medically determinable

impairments and in assessing pain and credibility.

This case is **REMANDED** to the Commissioner of Social Security pursuant to Sentence

Four of 42 U.S.C. § 405 (g) for further proceedings not inconsistent with this opinion.  The Clerk

should enter a judgment and close the case.

**DONE AND ORDERED** this 16th day of March, 2007.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

The Honorable Henry U. Snavely
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL               32817